UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| KISHA NORMAN,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>CLARK COUNTY DEPARTMENT OF<br>JUVENILE JUSTICE SERVICES,<br><br>　　　　　Defendant. | Case No. 2:14-cv-01622-APG-GWF<br><br>**ORDER GRANTING THE**<br>**DEFENDANT'S MOTION FOR**<br>**SUMMARY JUDGMENT**<br><br>(ECF No. 38) |

　　　　Plaintiff Kisha Norman was a part-time hourly employee at the juvenile detention facility operated by defendant Clark County Department of Juvenile Justice Services (DJJS). Norman was at the facility during a melee in the dining hall during which she claims to have observed two white probation officers use excessive force on an African-American juvenile. Norman asserts that as the incident was occurring, she stated "that's excessive force" and the officers heard her statement. She contends she was fired the next day in retaliation for her report of excessive force motivated by racial animus. She brings claims against DJJS for retaliation under 42 U.S.C. § 1981 and Title VII.

　　　　DJJS moves for summary judgment. I grant DJJS's motion because Norman has not shown a genuine dispute about causation. Specifically, Norman has not presented evidence that the decision maker was aware of her report of excessive force at the time he made the decision to terminate her employment at the detention facility. She also has not raised a genuine dispute that subordinate employees with a retaliatory motive influenced or participated in the decision making process that resulted in her termination.

**I. BACKGROUND**

　　　　Norman worked as an on-call, part-time juvenile services assistant with DJJS starting in March 2012. ECF No. 38-1 at 13, 67, 78. As such, she was scheduled to work as needed during times when other staff at the juvenile detention center were on vacation or had other scheduled

time off. ECF No. 56 at 7.  Her duties included providing direction to the juveniles, supervising them, conducting health and welfare checks, and other duties as assigned. *Id.*

According to Norman, between her date of hire and the date of the incident preceding her termination, no one ever told her that her job performance fell below the expected standards. ECF Nos. 38-1 at 84; 56 at 17.  Rather, Norman states, her supervisors praised her for her efforts. ECF No. 56 at 17.  However, there were some instances where probation officers complained about Norman's behavior, including that she littered out of county-marked cars, that she represented dirty laundry as clean, and that she did not properly conduct health and welfare checks. ECF Nos. 38-1 at 139, 148, 152; 38-2 at 5.

The brawl in the dining hall took place on March 12, 2013. ECF No. 38-1 at 96.  Earlier that day, probation officer David Carlisle complained to Carolyn Banks, one of the probation supervisors, that he did not want to work with Norman any longer because she did not interact with or direct the juveniles, she was "just a body," and he did not think she would "back up the staff." *Id.* at 143, 190.  Carlisle was concerned because he believed tensions were running high among the juveniles in his unit. *Id.* at 186.  In response to Carlisle's concerns, Banks assigned two other employees to assist with Carlisle's unit during the dinner service. ECF Nos. 38-1 at 143, 186, 190, 204; 38-2 at 9.

Later that day, a fight broke out in the dining hall after one of the juveniles threw his tray of food at another juvenile and a probation officer. ECF Nos. 38-1 at 98, 100, 103; 38-2 at 54.[1] Probation officers deployed pepper spray and yelled for the juveniles to get on the floor. ECF No. 38-1 at 97.  Some of the juveniles complied but others continued fighting. *Id.* at 100, 104. Norman had her back against the wall looking out into the dining hall. *Id.* at 98.  According to Norman, probation officer Jaqueline Alvarado told Norman to stay where she was and to keep the boys down on the floor. *Id.* at 100, 106.  This was consistent with training for part-time hourly employees who were told that if violence breaks out, they should not intervene and should stay out of the way. *Id.* at 187.  According to Alvarado, she told Norman to "do something," although

---

[1] *See also* exhibit S to DJJS's summary judgment motion for a video of the incident.

she provided no guidance about what she expected Norman to do. *Id.* at 209, 218. Lisa Johnson, the other part-time employee present during the fight, was directing the juveniles near her to remain on the ground. *Id.* at 211; ECF No. 38-2 at 9-10.

One of the boys involved in the initial altercation, Harper, was lying on the floor on his stomach. ECF No. 38-1 at 107. Two probation officers, Dana DeHesa and Alvarado, handcuffed Harper but Harper started squirming on the floor. *Id.* at 107-08, 110; ECF No. 38-2 at 68. Two other probation officers, Damian Storla and Philip DiCalegero (who are both white), came over to assist. ECF No. 38-2 at 76. Storla and DiCalegero got Harper to his feet, but shortly thereafter took him to the ground again after Harper spit on DiCalegero. ECF No. 38-1 at 110, 111, 216.

At this point, the stories diverge. According to Norman, one of the white probation officers then struck Harper multiple times in the head and the other put his knee in Harper's back and struck Harper several times in the back. *Id.* at 107, 111, 113; ECF No. 56 at 20. The two white male probation officers are Storla (in the green shirt in the video) and DiCalegero (in the red shirt in the video). Norman claims she stated "that's excessive force" loud enough for the officers to hear her. ECF No. 38-1 at 113. Norman claims that the officers looked up at her, said something to each other, and stopped hitting Harper. *Id.*; ECF No. 56 at 20-21. Then one of them told her to "get back." ECF No. 56 at 21. According to Norman, the video of the incident does not show the excessive force because of the angle of the video, but she was in a direct line of sight, with no obstruction. *Id.* All of the officers involved in controlling the scene in the dining hall (including Storla and DiCalegero) deny that they used excessive force, that they observed the use of excessive force by other officers, or that they heard Norman mention excessive force. ECF Nos. 38-2 at 69, 73, 76-77, 83-84; 42 at 2-3; 49; 50 at 3.

After relative order was restored but while some juveniles were still lying unrestrained on the dining hall floor, Norman walked over to a door to let in fresh air. ECF Nos. 38-1 at 114-15; 38-2 at 10. Eventually the boys were lined up and returned to their unit. ECF No. 38-1 at 116. According to Banks, other employees were attempting to control the situation and providing aid to the youths who were suffering the aftereffects of the pepper spray except Norman, who was in

the control room eating her lunch. ECF Nos. 38-2 at 128; 41 at 2. Norman, however, avers that she assisted in walking the juveniles back to their rooms. ECF No. 56 at 22.

The standard operating procedures for part-time staff include a requirement that any child abuse allegations must be reported immediately to the child abuse hotline. ECF No. 38-1 at 19. Norman did not fill out a report about the incident that day. *Id.* at 119. According to Norman, she asked if she could fill out a report but probation officer Carlisle told her she could not because part-time employees do not fill out reports. *Id.* at 116; ECF No. 56 at 21. Norman also asserts that nearly all the probation officers went to watch the video of the incident before filling out their incident reports. ECF No. 38-1 at 116.

The next day, Patrick Schreiber, then-assistant director for DJJS, attended a regularly-scheduled supervisors' meeting. *Id.* at 158. As normally happened at other supervisors' meetings, the discussion turned to the performance of part-time hourly employees. *Id.* at 159. During that discussion, one of the supervisors raised the issue that Norman did not assist during the dining hall incident. *Id.*; ECF No. 38-2 at 120, 151, 167. Several of the supervisors (including Banks, Donald McLeod, and Marcus McAnally) expressed that they were not interested in having Norman work on their shifts or in their units due to safety and security concerns. ECF Nos. 38-1 at 158; 38-2 at 129, 150-51; 41 at 3. According to Schreiber, this was the "expressed consensus from a number of supervisors . . . ." ECF No. 38-1 at 158. None of the supervisors volunteered to take Norman despite the regular need for personnel because the supervisors believed she would not respond appropriately in emergencies and she had to be told what to do. *Id.* Schreiber also heard, for the first time, various other complaints about Norman's performance, including that she did not seem motivated, did not interact well with the juveniles, and tended to be in the control room or office instead of interacting with the youth. *Id.* at 159-60. No one told Schreiber that Norman had stated two white officers had used excessive force on an African-American juvenile. ECF No. 38-2 at 153.

That same day, Schreiber sent an email to Sergio Alvarez-Serna, the timekeeper, stating that supervisors had advised Schreiber that Norman was "not working out well and should not be

used in the future." ECF Nos. 38-1 at 144; 38-2 at 163.  Alvarez-Serna responded the next day, asking Schreiber to "[l]et me know when I can send the termination letter." *Id.*  According to Schreiber, his decision to terminate Norman was based on what others said to him about her work performance. ECF No. 38-2 at 141.  He denies that his decision to terminate her had anything to do with race or her concerns about excessive force. ECF No. 38-1 at 161.

When Norman was not called back in to work, she called to ask if she would be needed. ECF No. 56 at 23.  She was told that her services were not needed that day. *Id.*  She called again on March 25 and was told she was marked as "not available." *Id.*  Norman responded that she was always available and she was told she should talk to DJJS administration. *Id.*  That same day, Norman spoke to Alvarez-Serna. *Id.*  He suggested that Norman fill out another availability sheet, which she did. *Id.*  She also spoke with then-manager of DJJS, Mark Humphries. *Id.*  Humphries did not tell Norman she had done anything wrong. *Id.*  Instead, he said he would call her back but he did not. *Id.*  Norman's further efforts to contact Humphries were unsuccessful. *Id.* at 23-24.

On March 26, Norman was called in to work but not at the detention facility. *Id.* at 24.  The probation officer on duty told Norman she was no longer on the roster for the detention facility and sent her to booking, where she worked for the rest of that day. *Id.*

Although Humphries had not responded to Norman, he sent an email to Schreiber and the probation supervisors stating that Norman had called and would like more information about her performance issues. ECF No. 38-1 at 141.  Probation supervisor Goetz responded, stating that she thought Norman was "a poor worker, with no safety and security mindset." *Id.*  Goetz also indicated there was "some concern about [Norman's] ability to perform the duties of the job after the fight in the dining hall with unit E2." *Id.*  Upon receiving this email, Humphries thanked Goetz and stated "this helps." *Id.*

On March 29, Norman wrote a letter to Humphries and Schreiber. *Id.* at 120; ECF No. 38-2 at 34.  In that letter, Norman gave her version of the dining hall incident, including that two officers hit Harper on his back and head. ECF No. 38-2 at 35.  Her letter did not mention the race of the officers or the detainee.

On April 4, Schreiber sent a letter to Norman indicating she would no longer be working for DJJS. *Id.* at 122; ECF No. 38-2 at 172.  Norman called Schreiber stating she was going to report excessive force during the dining hall incident. ECF No. 38-1 at 160.  According to Schreiber, this was the first time he heard anything about excessive force being used during the incident even though he was an addressee on Norman's March 29 letter. *Id.* at 160-61.  Schreiber told Norman that the video from the incident was preserved and that the matter was being reviewed. *Id.* at 160.

That same day, Schreiber sent an email to the probation supervisors stating that he had spoken to Norman about her services no longer being needed. *Id.* at 147.  Schreiber stated that although he had received verbal comments previously about Norman's performance, he needed emails from the supervisors because Norman stated she had been called regularly, was complimented on her work, and would be making an Equal Employment Opportunity Commission (EEOC) complaint. *Id.*  Banks then emailed some of her employees asking them to email her with "any work interactions you had with this employee in which you felt her work performance was not sufficient." *Id.* at 149.

Banks responded to Schreiber's email by documenting various issues with Norman, including that Norman did not want to work in the girls' unit, did nothing to supervise the juveniles during the dining hall incident, did not assist in walking the juveniles back, and then went to the control room to eat. *Id.* at 143.  Probation supervisor McAnally wrote that Norman was "more concerned about eating during her shift than supervising youth." *Id.* at 147.  McAnally also stated that he thought Norman "showed zero initiative." *Id.*  Probation officer Jacqueline Gonzales stated that Norman did not physically conduct health and welfare checks, once tried to pass off dirty laundry as clean, and took an excessive amount of time to return dinner trays to the kitchen. *Id.* at 148, 175.  Probation officer Rebeca Alvarez stated that Norman would not interact with the youths and would not voluntarily secure the youths in their cells unless directed. *Id.* at 150, 175.

At some point after Norman's termination, Norman called Banks and asked for the names of the two white officers who she claims used excessive force on Harper. *Id.* at 190. Banks responded that she was not aware of two white officers who used excessive force on a juvenile. *Id.* at 191.

On April 9, Norman sent a letter to the EEOC. *Id.* at 122-23. On August 5, she filed an EEOC complaint. *Id.* at 121. The EEOC issued her a right to sue letter. ECF No. 13 at 1. Norman then filed this lawsuit against DJJS alleging retaliation under 42 U.S.C. § 1981 and Title VII.[2]

## II. ANALYSIS

Summary judgment is appropriate if the pleadings, discovery responses, and affidavits demonstrate "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to set forth specific facts demonstrating there is a genuine issue of material fact for trial. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir. 2000). I view the evidence and reasonable inferences in the light most favorable to the non-moving party. *James River Ins. Co. v. Hebert Schenk, P.C.*, 523 F.3d 915, 920 (9th Cir. 2008).

Title VII prohibits retaliation by making it unlawful "for an employer to discriminate against any of [its] employees or applicants for employment . . . because [she] has opposed any practice made an unlawful employment practice by this subchapter . . . ." 42 U.S.C. § 2000e3(a).

---

[2] Schreiber initially was a defendant in this action but was dismissed pursuant to the parties' stipulation. *See* ECF Nos. 1, 25. Additionally, Norman asserted a First Amendment claim but she stipulated to dismiss it. *Id.*

Section 1981 also encompasses employment retaliation claims. *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 445 (2008). The legal principles governing a section 1981 retaliation claim and a Title VII retaliation claim are the same. *Manatt v. Bank of Am., NA*, 339 F.3d 792, 797 (9th Cir. 2008).

To make out a prima facie case of retaliation under Title VII, the plaintiff must establish that: "(1) she engaged in a protected activity, such as the filing of a complaint alleging racial discrimination, (2) the [employer] subjected her to an adverse employment action, and (3) a causal link exists between the protected activity and the adverse action." *Id.* at 800 (quotation omitted). If the plaintiff establishes a prima facie retaliation claim, the burden shifts to the employer "to articulate a legitimate, non-discriminatory reason for the adverse employment action." *Id.* If the defendant does so, then the plaintiff "bears the ultimate burden of demonstrating that the reason was merely a pretext for a discriminatory motive." *Id.* (quotation omitted).

"The causal link can be inferred from circumstantial evidence such as the employer's knowledge of the protected activities and the proximity in time between the protected activity and the adverse action." *Dawson v. Entek Int'l*, 630 F.3d 928, 936 (9th Cir. 2011); *see also Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1197 (9th Cir. 2003) ("[T]he plaintiff must make some showing sufficient for a reasonable trier of fact to infer that the defendant was aware that the plaintiff had engaged in protected activity."). Additionally, under the "cat's paw metaphor," even if the final decision maker lacked retaliatory intent, the plaintiff can establish the causal link by "proving that [a] biased subordinate influenced or was involved in the decision or decision making process." *France v. Johnson*, 795 F.3d 1170, 1176 (9th Cir. 2015), *as amended on reh'g* (Oct. 14, 2015) (quotation omitted).

Schreiber decided to terminate Norman's services at the detention facility the day after the dining hall incident based on the supervisors' comments at the March 13 meeting. There is no evidence that before he made this decision, anyone told him that Norman had made a claim of excessive force, much less that her claim included an assertion that the excessive force was

motivated by racial animus. Her retaliation claims thus lack the essential causal link between her alleged protected activity and her termination.

There also is no evidence from which a reasonable fact finder could infer that the probation officers who heard Norman state "that's excessive force" influenced or were involved in the decision making process that resulted in Norman's termination under a cat's paw theory. There is no evidence that Storla, DiCalegero, or any other probation officer within hearing distance told anyone that they heard Norman make a claim of excessive force or that they understood there was a racial component to this allegation. There is no evidence Storla or DiCalegero complained to a supervisor about Norman's performance with the intent to have her fired or otherwise initiated the conversation about Norman's performance at the regularly scheduled supervisors' meeting. They are not supervisors and there is no evidence they attended that meeting. Instead, Norman's performance was raised as part of the normal discussion on part-time hourly employees. Multiple supervisors at the meeting expressed concerns about Norman's performance on a variety of issues and no supervisor volunteered to use Norman in his or her unit. There is no evidentiary basis for a reasonable jury to conclude that Storla, DiCalegero, or other probation officers with a retaliatory intent influenced (1) multiple supervisors to speak out about Norman's performance issues and (2) every supervisor to decline to accept Norman in their unit. *Compare Poland v. Chertoff*, 494 F.3d 1174, 1183-84 (9th Cir. 2007) (employee's retaliatory intent imputed to employer where that employee initiated the administrative inquiry, submitted a lengthy memo outlining various acts of malfeasance, provided the names of witnesses for the inquiry panel to contact, and provided the panel with another employee's notes on the plaintiff's performance); *Gilbrook v. City of Westminster*, 177 F.3d 839, 857 (9th Cir. 1999), *as amended on denial of reh'g* (July 15, 1999) (retaliatory bias of employees not absolved by neutrality of final decision maker where one employee spearheaded the investigation, kept others apprised in closed-door meetings, and prepared the notice of discharge; and the other employee served as a hearing officer after attending the closed-door meetings and met with the first employee to discuss the notice of discharge). Thus, unlike other cat's paw cases, there is no

evidence Storla, DiCalegero, or other probation officers who may have had a retaliatory intent initiated the conversation about Norman's performance at the supervisors' meeting or played a role in the decision making process that resulted in her termination.

Norman relies on the complaint by Carlisle that Norman would not have probation officers' backs as evidence that Carlisle meant Norman was willing to call out probation officers for excessive force. However, Carlisle made this complaint before the dining hall incident, as evidenced by Banks assigning two additional employees to Carlisle's unit for the dinner service in response to his concerns. Thus, Carlisle could not have been referring to Norman's willingness to oppose the use of excessive force.

Norman also relies on statements from other DJJS employees who generally discuss the culture at DJJS as racially biased, abusive, and hostile to employees who report excessive force by a probation officer. ECF Nos. 60 at 42-43, 45-46; 61 at 32-34, 39, 49, 51-52, 58, 60; 62 at 47; 63 at 6. Two of these employees also state that they heard through the rumor mill that Norman had complained about excessive force and then was fired. ECF No. 61 at 30-31; 62 at 46. However, these employees did not identify when and from whom they heard that Norman was fired for reporting excessive force. Additionally, one of these employees previously had reported a probation officer for using excessive force and was not fired or otherwise retaliated against for doing so. ECF No. 63 at 19-20.

It is conceivably possible that the probation officers and their supervisors closed ranks and retaliated against Norman for opposing excessive force. But Norman relies on speculation, rumor, and innuendo. She does not present evidence raising "a reasonable inference that it did in fact occur." *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011). I therefore grant DJJS's summary judgment motion.

### III. CONCLUSION

IT IS THEREFORE ORDERED that defendant Clark County Department of Juvenile Justice Services' motion for summary judgment **(ECF No. 38) is GRANTED**. The clerk of court

is instructed to enter judgment in favor of defendant Clark County Department of Juvenile Justice Services and against plaintiff Kisha Norman.

DATED this 24th day of March, 2017.

_____
ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE